## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| **ELI LILLY AND COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **1:04-cv-0446-SEB-VSS** |
| **vs.** | ) | |
| | ) | |
| **ZURICH AMERICAN INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### <u>ENTRY</u>

This matter is before the court on competing motions for summary judgment.  For the reasons discussed in this entry, we grant Plaintiff's Motion for Partial Summary Judgment on its claim of breach of contract and grant in part Defendant's Motion for Summary Judgment on Plaintiff's claim of bad faith.

## I.      **Summary Judgment Standard**

Summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). In determining summary judgment, the court views all evidence and draws

reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-51 (1986). The scope of coverage provided by an insurance policy, however, is a question of law particularly appropriate for resolution at the summary judgment stage since factual disputes, if any, are ordinarily limited to the amount of loss for which an insurer may be liable. *See Duane Reade, Inc. V. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 389 (2nd Cir. 2005)*; National Fire and Casualty Co. V. West by and Through Norris*, 107 F.3d 531, 534-535 (7th Cir. 1997); *Hurst-Rosche Engineers, Inc. V. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir.1995).

## II.    Factual Background

### A.    The Insurance Policy

Eli Lilly and Company ("Lilly") purchased an insurance policy ("Zurich Policy") from Zurich American Insurance Company ("Zurich") for the period January 1, 2001, through January 1, 2002. The material terms of the Policy are not in dispute. The Zurich Policy is a claims made excess liability policy providing comprehensive general liability coverage of up to $7 million for a loss over and above $3 million.

The Zurich Policy obligates the Defendant to indemnify Lilly, subject to the policy limits and underlying threshold amount, for the amount Lilly pays in settlement of claims of liability for damages on account of alleged injury. The

policy language which describes the coverage provides as follows:

> In the event that a claim or claims are first made, in writing, against the Insured during the period of this Policy arising from a Loss which took place on or after 1st January, 1992 (hereinafter referred to as the Retroactive Date), where allowable, Underwriters will indemnify the Insured, subject to the Limits of Liability set forth in the Declarations and the applicable provisions of this Policy, for that amount of the ULTIMATE NET SUM PAYABLE in excess of the UNDERLYING AMOUNTS OBLIGATIONS OF THE INSURED which the Insured shall be obligated to pay by reason of the liability:-
>
> > (a) imposed upon the Insured by law, or
> > (b) assumed by the Insured under contract or agreement,
>
> for damages on account of:-
>
> > (i) Personal Injuries,
> > (ii) Property Damage,
> > (iii) Advertising Injury,
>
> resulting from each Loss, but only such Personal Injuries, Property Damage and Advertising Injury, neither expected nor intended by the Insured, as respects the claim or claims that are first made, in writing, against the Insured during the period of this Policy.
>
> It is agreed that a claim or claims first made against the Insured shall be the first written demand made against the Insured for money or services in respect of such injury or damage as is insured by this Policy and the date of a claim or claims first made shall be the date of the first such written demand against the Insured.

The Zurich Policy defines "Ultimate Net Sum Payable" as follows:

> The words "ULTIMATE NET SUM PAYABLE",wherever used in this Policy, mean the total sum the Insured is obligated, either through adjudication or compromise, to pay as damages in respect of any Loss that would, in accordance with the Declarations, Insuring Agreements, Definitions, Exclusions and Conditions of this Policy, be covered by this Policy including investigation, adjustment, experts, appraisal, legal, appeal and any defense costs and expenses (referred to in this Policy as "Costs and Expenses") paid or incurred by the Insured or paid or incurred by Underwriters on behalf of the Insured.
>
> The following shall not be included within the meaning of ULTIMATE NET SUM PAYABLE:
>
> a) such "Costs and Expenses" which the Insured, or on whose behalf any insurer,

-3-

has paid or incurred or is obligated to pay as respects the UNDERLYING AMOUNTS:

b) salaries of the Insured's or any insurers; permanent employees.

The Zurich Policy includes endorsement language which excludes coverage for "products liability" and "completed operations liability" hazards. The language of the exclusionary endorsement states, in relevant part:

This Policy is amended in that notwithstanding anything contained herein to the contrary, it shall not apply to –

i) the Products Liability Hazard;
ii) the Completed Operations Liability Hazard.

Lilly also maintained insurance policies with other providers to fill in some of the gaps in coverage existing in the Zurich policy.  These included a similar comprehensive liability policy covering the first million dollars of loss on any claim and an umbrella policy with general liability coverage attaching after the first $10 million and products liability and completed operations liability coverage attaching above the first $25 million.

**B.    The Underlying Litigation**

Lilly manufactures, markets and sells the chemotherapy drug known as Gemzar.  Lilly sells Gemzar in a powdered form to wholesalers, who in turn sell the drug to other wholesalers or health care providers.

Beginning in August 2001, Lilly and others were named as defendants in over 200 lawsuits ("Courtney Litigation") resulting from the actions of Robert R. Courtney ("Courtney"), a pharmacist who operated an oncological pharmacy in Kansas City, Missouri.  Courtney's pharmacy practice was unique; he did not fill prescriptions to the general public in the familiar fashion.  Rather, Courtney received and processed custom-formulated prescriptions from physicians treating cancer patients, which he used as a formula or recipe to make or reconstitute the usual injectable liquid formula called for by the prescription. Gemzar was one of the cancer- fighting ingredients often called for in the prescriptions handled by Courtney.  Had Courtney followed the doctors' orders, he would have utilized the specified amounts of Gemzar (or other chemotherapy drugs), together with the correct amounts of saline solution, to create an injectable chemotherapy prescription.  Instead, as a criminal investigation revealed, Courtney diluted the active ingredient (Gemzar, in Lilly's case) by adding more saline solution than was called for, which yielded an intravenous solution containing substantially less of the active chemotherapy drug than prescribed.

On August 23, 2001, Courtney was indicted in eight counts of product tampering, adulteration and misbranding of six doses of chemotherapy drugs prepared by him between May and August of 2001.  In February 2002, after affected patients had filed civil litigation arising out of his criminal conduct,

Courtney pled guilty to the criminal charges.  The civil litigation claims brought by the affected patients included claims against Lilly and another pharmaceutical manufacturer, which alleged that Lilly either should have known or did know of Courtney's actions and the dangers they posed, and that Lilly and the other pharmaceutical manufacturer should have warned or otherwise notified plaintiffs and others.  Plaintiffs also alleged a variety of personal injuries and resultant damages arising from the conduct of which they complained.

Lilly notified its insurance carriers of the Courtney Litigation. With respect to Zurich, Lilly provided written notice of the claims in a letter dated December 18, 2001.  Zurich acknowledged receipt of Lilly's written notice on February 14, 2002.  Lilly settled the Courtney Litigation in October 2002 for an amount substantially in excess of $10 million.  Lilly then requested, from Zurich and its other insurers, reimbursement of the amounts paid in defending and settling the Courtney Litigation.  Zurich denied Lilly's claim under the policy exclusions for product liability hazards and completed operations hazards.  That denial by Zurich prompted this lawsuit by Lilly, who claims entitlement to coverage and who further asserts that Zurich's denial was in bad faith.

### III.   Analysis

#### A.   Does the Zurich policy provide coverage for the Courtney Litigation?

Lilly claims coverage of this claim is provided for in the Zurich Policy and that it should be reimbursed for the money it expended to settle the Courtney Litigation. The Courtney Litigation was based on the harm caused to the patients by Courtney's dilution of the prescribed chemotherapy drugs.  The dilution was a wrongful act by Robert Courtney, a pharmacist not in the employ of Lilly.  Lilly's alleged responsibility arose from the patients' claims that, through accounting procedures used to monitor the use of its drugs, Lilly knew or should have known of the dilution and should have acted, but did not, upon that information to protect the patients.  There has been no claim that the product, Gemzar, was itself the cause of any harm.

The Zurich Policy is a general liability policy intended to cover costs and damages resulting from claims arising out of a wide range of circumstances. Under the policy's basic provisions, without endorsements, there is no question that the 'Courtney Litigation' is a covered claim.  However, Zurich denies coverage based on two exclusions set out in a policy endorsement:  the "Product Liability" exclusion and the "Completed Operations Liability" exclusion.

A federal court sitting in diversity applies state substantive law.  *See*

*Mercado v. Ahmed*, 974 F.2d 863, 866 (7th Cir. 1992).  Under Indiana law, insurance contracts are examined under the same rules of construction as any other contracts.  *National Fire and Cas. Co. V. West by Norris,* 107 F.3d 531, 535 (7th Cir. 1997); *Indiana Farmers Mut. Ins. Co. v. Imel*, 817 N.E.2d 299, 302 (Ind. App. 2004).  When an insurance contract "is clear and unambiguous, the language therein must be given its plain meaning."  *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985).  If there is an ambiguity, then the ambiguous portion of the insurance contract must be viewed from the standpoint of the insured and strictly construed against the insurer.  *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000).  Such an ambiguity exists only if reasonable people could disagree about the meaning of the contract's terms.  *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002). This does not mean that an ambiguity exists simply because an insured and an insurer may disagree about the meaning of a provision.  *Id.*  We, therefore, must determine if the exclusionary language in the policy is ambiguous.  If it is, the provision is construed in Lilly's favor.  If it is not, we apply the plain meaning of the language to Lilly's claim for coverage.

## 1.     The Product Liability Exclusion

The Zurich Policy defines the "product liability hazard" as follows:

> The words "PRODUCT LIABILITY HAZARD", wherever used in this
> Policy, mean Personal Injuries and/or Property Damage arising out of the
> Insured's Products or reliance upon a representation or warranty made at any
> time with respect thereto, but only if the Personal Injuries or Property
> Damage occurs away from premises owned by or rented to the Named
> Insured and after physical possession of such products has been relinquished
> to others.

There is no question that the damages alleged in the Courtney Litigation
occurred away from Lilly's premises and after the product had been
relinquished to others. However, this dispute relates to the meaning of the
phrase "arising out of." As stated previously, the fact of a dispute does not, in
and of itself, establish an ambiguity. Under Indiana law, policy terms are to be
interpreted from the perspective of an ordinary policyholder. *Burkett v.
American Family Ins. Group*, 737 N.E.2d 447, 452 (Ind.App.2000). We conclude
on that basis that an ordinary policyholder, reading a product liability
exclusionary clause which contains language excluding from coverage any
claim for damages "arising out of the Insured's Products," would consider
himself without coverage for a claim asserting that his product had caused
some harm. We do not believe an ordinary policyholder would read this
language to bar coverage of a claim that he failed to alert someone to the
activities of another who was wrongfully dispensing the product. In their
lawusit, the patient-plaintiffs in the Courtney Litigation were, in effect, saying,
"Lilly, you are liable because you did not tell anyone that Courtney was selling
more formulated Gemzar than could be expected to be produced from the

amount of bulk product he was purchasing from you." This is not the type of claim for which coverage was excluded under the plain language of the product liability exclusion in the Zurich Policy endorsement. Even if we were to find the exclusionary provision ambiguous, we would be required to construe the clause in a light most favorable to Lilly, as the insured. We therefore conclude that this claim against Lilly was not excluded from coverage in the Zurich Policy. *Bosecker*, 724 N.E.2d at 244.

In reaching this conclusion, we have determined that an average person reading the product liability exclusion would assume that, in order for the exclusion to apply, there would necessarily be a causal connection between the harm for which an insured was being blamed and the insured's product. That circumstance does not exist here; the alleged harm resulted from Lilly's failure to act on knowledge it possessed or should have possessed.

Zurich argues an alternative interpretation of the "arising out of" language, likening it to a "but-for" or "efficient and predominating cause" test. It cites *Franz v. State Farm Fire & Cas. Co.*, 754 N.E.2d 978 (Ind. App. 2001)(general liability policy which excluded coverage for bodily injury arising out of ownership or use of auto found not to provide coverage to insured church for claim of person injured in church sponsored "bus pull") and *Sharp v. Indiana Mut. Ins. Co.*, 526 N.E.2d 237 (Ind. App. 1988)(because policy excluded coverage for injury arising out of ownership or use of vehicle,

-10-

homeowners policy did not provide coverage when insured was sued for injury resulting from auto accident caused by insured when he drove after becoming intoxicated at home) as support for its interpretation.  Though we decline to adopt this interpretation, we hasten to note that the application of a "but-for" or "efficient and predominating cause" test to Lilly's product in this case does not in the final analysis advance Zurich's position.

Zurich argues that,  under its proposed interpretation, there would be no coverage because  "but for Gemzar, Lilly would not have been sued."  However, in light of the cases cited by Zurich, the harm that a "but for" interpretation refers to is the harm to the patient-plaintiffs in the Courtney Litigation, not the harm to Lilly from being sued.  Zurich's argument is unavailing.  The proper formulation of the "but for" test applied to the Courtney Litigation would be: "but for Gemzar, the plaintiffs in the Courtney Litigation would not have suffered a harm."  This is decidedly not the gist of that lawsuit.

Gemzar, as we have previously noted, is a chemotherapy drug used to fight cancer.  The harm to the patients was that they <u>did not</u> receive a sufficient amount of <u>any</u> chemotherapy drug.  In other words, the "predominating cause" of the patient-plaintiffs' injury was not Lilly's product, (indeed, the patients were injured in not getting enough Gemzar) but Courtney's act of diluting the product and Lilly's imputed liability based on its knowledge (or its required knowledge) of that fact, not on what Lilly had produced.  Stated otherwise,

Lilly's culpability emanated form its failed duty to tell the patients what it knew about Courtney's derelictions, not from how it manufactured its product.  Had Courtney given the patients pure saline solution, Lilly would be liable for the same alleged harm.  Zurich's 'but-for' test fails because the harm could have occurred without any involvement of Gemzar.  The Courtney litigation could, and most likely would, have proceeded even if Courtney had provided the patients with pure saline solution, as long as the patient-plaintiffs' pursued their theory of liability against Lilly based on what Lilly knew or should have know of Courtney's criminal actions.

### 2.    The Completed Operations Liability Exclusion

The Zurich Policy defines the "completed operations liability hazard" as follows:

> The words "COMPLETED OPERATIONS LIABILITY HAZARD", wherever used in this Policy, mean Personal Injuries and/or Property Damage which arise out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the Personal Injuries or Property Damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Insured.

> "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times: -

> (a) when all operations to be performed by or on behalf of the Insured under the contract have been completed,

> (b) when all operations to be performed by or on behalf of the Insured at the site of the operations have been completed,

-12-

(c) when the portion of the work out of which the Personal
Injuries or Property Damage arises has been put to its
intended use by any person or organisation [sic] other than
another contractor or sub-contractor engaged in performing
operations for a principal as a part of the same project.

Operations which may require further service or maintenance work,
or correction, repair or replacement because of any defect or
deficiency, but which are otherwise completed, shall be deemed
completed.

The Completed Operations Liability Hazard does not include
Personal Injuries or Property Damage arising out of: -

(a) operations in connection with the transportation of property,
unless the Personal Injuries or Property Damage arises out
of a condition in or on a vehicle created by the loading or
unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned
or unused materials.

We find nothing ambiguous about this language. This provision excludes
harms caused by an operation after that operation has been completed or
harms caused by representations made with regard to that completed
operation. Since the language is not ambiguous, we apply the plain meaning of
this clause to the facts of the present case to determine if the claims against
Lilly are excluded from coverage. *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d
at 470.

The first issue is which, if any, Lilly operation resulted in the harm
claimed by the patient-plaintiffs in the Courtney Litigation. Once the operation
is identified, we must determine whether it was completed. If the operation

alleged to have caused the harm was completed, then it would be excluded under the contract clause.

Zurich argues that the harm here arose out of the completed production of Gemzar.  We are not convinced by that contention.  As previously stated, the Courtney patient-plaintiffs did not claim that the Gemzar product caused them harm.  Indeed, no aspect of the production of Gemzar was alleged to have been defective or harmful.  Thus, there is no blame assignable to Lilly based on the operation of producing the drug.

The policy exclusion also includes harms caused by a person's reliance upon a representation or warranty.  As Zurich reminds us, at least one Indiana court has found that a completed operations hazard exclusion may be invoked to defeat coverage for a claim of harm caused by  reliance upon a representation with respect to a completed service.  *American States Ins. Co. v. Aetna Life & Cas. Co.*, 379 N.E.2d 510 (Ind. App. 1978).  In *American States*, the court found that a florist's representation that a flocked Christmas tree was fireproof, when it turned out not to be, was part of a completed operation (the operation of flocking a tree and delivering it) and the resulting fire occurred because of the purchaser's reliance upon that representation; accordingly, the injury from the fire was not covered by the florist's  liability insurance.  *Id* at 514.  However, the holding in *American States* is inapposite to the facts in this case.  Lilly is not alleged to have made any representation about its product

that led to the patient-plaintiffs' harm.  Zurich contends that Lilly's failure to warn about possible dilution of Gemzar is equivalent to the failure to warn that a flocked tree was a fire hazard.  The difference to us is obvious, however, in that in *American States* the failure to warn related to a harm caused by the operation of flocking a tree (and, in fact, the inaccurate representation that the tree was fireproof).  Here, in contrast, for *American States* to apply,  Lilly would have been required to warn of a harm caused by a third party not under Lilly's control or part of a Lilly operation.  There was nothing about Gemzar, or Lilly's operation of producing it, that the Courtney Litigation plaintiffs alleged would have required Lilly to issue a warning.

The Courtney Litigation patient-plaintiffs maintained in their lawsuit against Lilly that Lilly's product accounting activities would or should have alerted it to Courtney's misdeeds.  According to the patient-plaintiffs, Lilly's accounting processes allowed it to monitor prescriptions and sales of its products.  They asserted that through this process Lilly had discovered or should have discovered that Courtney was selling more Gemzar in his formulary prescriptions than was appropriate given the amount he was purchasing, creating a duty on the part of Lilly to warn them, their prescribing doctors, or proper authorities of the possibility that the Gemzar was being diluted.  Consequently, assuming it was a Lilly "operation" that caused harm to the Courtney plaintiffs, it would have been the ongoing accounting process that

-15-

entailed monitoring of the use of Lilly drugs.  We do not believe an accounting process can reasonably be deemed a "completed operation," if for no other reason than it is never completed.

Accordingly, neither the "Products Liability" nor the "Completed Operations Hazard" exclusion applies to Lilly's claim based upon the Courtney Litigation and Lilly is entitled to summary judgment on its claim seeking coverage and on Zurich's counterclaim seeking a denial of coverage.

## B.    Prejudgment Interest

Lilly has included a separate claim for prejudgment interest and Zurich has not opposed Lilly's request.  Under Indiana law, prejudgment interest is awarded when damages are readily calculable and interest is necessary to fully compensate the injured party.  *Johnson v. Eldridge*, 799 N.E.2d 29 (Ind. Ct. App. 2003).  In this case, the amount of damages owed is easily calculated. The maximum amount payable under the policy is $7 Million.  The settlement Lilly reached with the Courtney Litigation plaintiffs was well above $10 million, so that Lilly's $3 million retention was surpassed and all of the $7 million of coverage provided for in the Zurich Policy is owed.  The amount payable under the policy was ascertainable at the time of Lilly's request for reimbursement in February of 2003 and the insurance contract required Zurich to reimburse Lilly within 90 days of the request for reimbursement.  Therefore, as requested by

Lilly, interest is owed dating from May 16, 2003.  Since the parties did not agree in writing on a specific interest rate, we shall apply the statutory rate of 8% per annum, accepting Lilly's calculation of $1535 per day.  IND. CODE § 24-4.6-1-102.

### C.    Bad Faith

Indiana recognizes a "legal duty, implied in all insurance contracts, for the insurer to deal in good faith with its insured." *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002).   Under Indiana law, an insurer may be found to have acted in bad faith in violation of its duty, if it knowingly denies coverage when there is no rational or reasonable basis for doing so.  *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 520 (Ind. 1993).  However, "(t)he insurer does not necessarily breach its duty of good faith every time it erroneously denies an insurance claim." *Nelson v. Jimison*, 634 N.E.2d 509, 512 (Ind. Ct. App. 1994).  Absent an element of conscious wrongdoing, mere negligence, mistake of fact or law, honest error, or poor judgment do not amount to bad faith.  *See Worth v. Tamarack American, a Div. Of Great American Ins. Co.*, 47 F. Supp. 2d 1087, 1100 (S.D. Ind. 1999).

Generally, an insurer who acts with the knowledge that there is no reasonable basis for denying as claim, yet does so anyway, is operating in bad faith.  The following have been specifically identified under Indiana law as

-17-

examples of bad faith acts by an insurer:

> (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.

*Worth*, 47 F.Supp.2d at 1102.

To succeed on its claim of bad faith, Lilly must establish that Zurich committed one of these acts or otherwise denied claims when it knew that there was no reasonable basis for doing so.  Furthermore, for punitive damages to be available, Lilly must prove by clear and convincing evidence that the insurer acted with malice, fraud, gross negligence, or oppressiveness which was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing."  *Nelson* at 512.  A rational or principled basis for denying a claim forecloses a recovery for bad faith.  *Freidline* at 42.

Lilly has presented the court with substantial evidence of email communications between the parties during the investigative process of the claim.  However, these emails do not evidence a denial by Zurich of Lilly's claim knowing there was no reasonable basis for its denial.  Instead, they make clear that Zurich denied the claim based on its interpretation of the products liability exclusion in the insurance contract.  Lilly argues that because Zurich representatives said that they could "see both sides" of the dispute, Zurich

knew its denial was in bad faith.  Again, we are not persuaded by this argument.  If a representative of Zurich "saw both sides" of the dispute, it does not follow that Lilly's position was more correct than Zurich's.  It means only that the Zurich representative understood Lilly's argument; such an admission is not tantamount to an unreasonable rejection of Lilly's position.  Zurich's position as it turns out was incorrect under Indiana law, but a misinterpretation of law is not in and of itself evidence of bad faith.

Zurich's denial of coverage was based on its understanding of the exclusions in its policy; as such, it was a rational basis for denying coverage.  Zurich's view was not uninformed or arbitrary; it was predicated on case law from various jurisdictions where the insurance policy phrase, "arising out of," was at issue.  Lilly suggests that Zurich acted in bad faith because it failed to properly investigate and apply Indiana law.  However, an inadequate investigation or flawed interpretation of Indiana law does not constitute bad faith.  *See, e.g.*, *Worth*, 47 F.Supp.2d at 1102; *Freidline,* 774 N.E.2d at 42.  Zurich's ultimately ill-fated legal argument was not unreasonable, just incorrect, and incorrect does not equate to bad faith.

Lilly has not argued that Zurich engaged in any of the specifically prohibited actions for insurers, and we see no such violation.  Even in construing the evidence in Lilly's favor, it is clear that:  (1) Zurich's refusal to pay out was based on its mistaken belief that the claim was excluded under the

products liability clause of the insurance contract;  (2) Zurich did not cause an unfounded or unreasonable delay in making payment, because it denied payment outright while providing an explanation for its decision;  (3) Zurich did not affirmatively deceive Lilly; and (4) No evidence suggests that Zurich had or took unfair advantage of Lilly or that any unfair advantage was used to pressure Lilly into settling for less than full coverage. Lilly does assert that Zurich made attempts to dissuade Lilly from pursuing the coverage issue in litigation, but it did so only by reminding Lilly that litigation would be costly and time consuming, both of which are of course true.  In sum, we find no evidence to support a finding of bad faith on the part of Zurich in denying coverage to Lilly on these claims.

## IV.    Conclusion

The Zurich Policy provided coverage to Lilly for the claims arising out of the Courtney Litigation.  Zurich mistakenly interpreted, and based its denial on the products liability and completed operations exclusions in the contract.  The exclusions do not foreclose coverage because the claims against Lilly were not the result of product liability or completed operations liability, as described in the contract.  Despite Zurich's errors in interpreting the insurance contract provisions, its denial did not evidence bad faith on its part.

Accordingly, Plaintiff's Motion for Partial Summary Judgment (**Docket #**

**48**) is GRANTED.  Defendant's Motion for Summary Judgment (**Docket # 41**) is DENIED IN PART, with regard to Plaintiff's breach of contract claim and Defendant's Counterclaim, and GRANTED IN PART, with regard to Lilly's bad faith claim.   Judgment shall enter in favor of Lilly in the amount of $7 million plus prejudgment interest at the statutory rate of 8% per annum, to wit, $1535 per day, calculated from May 16, 2003.  A final judgment consistent with these rulings shall be entered separately.

   IT IS SO ORDERED   12/12/2005


SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Karen M. Dixon
MECKLER BULGER & TILSON
karen.dixon@mbtlaw.com

Michael M. Marick
MECKLER BULGER & TILSON
michael.marick@mbtlaw.com

Stephen J. Peters
STEWART & IRWIN PC
speters@silegal.com

Daniel Ryan Roy
BAKER & DANIELS
drroy@bakerd.com

Christopher G. Scanlon
BAKER & DANIELS
chris.scanlon@bakerd.com

Paul A. Wolfla
BAKER & DANIELS
paul.wolfla@bakerd.com